Donald P. Gorman, J.
The present proceeding under section 21 of the Stock Corporation Law was instituted by minority stockholders possessing' 477 shares of the 5,932 outstanding shares of preferred stock, par value $100, and 5,674 shares of the 40,000 outstanding shares of common stock, par value $25, of the Oneita Knitting Mills for an order determining the value of their stock or for the appointment of an appraiser to determine its value.
The respondent Oneita Knitting Mills, a domestic stock corporation organized in 1893, conducted its manufacturing operations entirely within the city of Utica, New York, until 1952. The original charter delineated the purpose of the corporation as'follows: “Second. That the objectives for which said corporation is formed are the manufacture and sale of knit underwear and knit goods and that the same is to be located and carried on at Utica in the County of Oneida and State of New York.”
Over a long period, the management of respondent had become increasingly aware of the difficulties confronting the *818 textile industry in northeastern United States, and had witnessed the liquidation of at least 17 textile, knitting or garment industries in the Utica area, the consolidation of several others, the conversion of some to rayon yarn and the removal of still others to different localities. In line with the industry trend to shift operations from the old high-cost plants in the northern States to low-cost southern plants, the respondent, in 1951, leased space in Andrews, South Carolina, and there embarked upon pilot plant operations. The respondent further negotiated for the construction, to its specifications, of a modern air-conditioned plant in Andrews which it leased in 1952 for a 10-year period, with options to renew for at least an additional 10 years and with the additional privilege of purchasing at any time, during the term of the lease or any renewal thereof, at cost less depreciation. This arrangement was utilized to avoid the capital outlay required to build the plant, and to obtain the tax advantage of rental rather than capital payments if profitable operations resulted.
On June 5, 1952, with due authorization of its stockholders, the respondent amended its certificate of incorporation as follows: “ Second. The purposes of the corporation are to manufacture, process, sell and otherwise deal in knit goods of any character, yarns, cottons, wool, rayon and any other raw or processed materials, to purchase, acquire, hold, pledge, sell or dispose of the stocks, bonds, notes and other securities and to guarantee the obligations of any other corporation and to do all acts and things as may be necessary, convenient or incidental to the foregoing.”
In December of 1952, the respondent began the manufacture in its new Andrews plant of various product styles previously manufactured in Utica. Until about September of 1954, however, the major portion of respondent’s operations continued in Utica, with the respondent sustaining net losses in round figures, before nonrecurring gains on sales of capital assets, of $375,000 in 1952, $201,000 in 1953 and $207,000 in the first eight months of 1954 at times when business in general was experiencing prosperity. Since 1947, the respondent had borrowed from the Guaranty Trust Company, its principal banker since 1913, to the extent that its credit was being impaired. By the spring of 1951, the respondent’s financial position in relation to its volume of business was reduced to the extent that this bank refused to continue granting the prime interest rate on respondent’s borrowings. Despite the sale of respondent’s investment in the Mutual Box Board Company and the surrender of certain life insurance policies, its working capital and *819 general financial condition continued to deteriorate, and by the spring of 1954, the bank informed the respondent that it would be unable to continue its present financial support after 1954. Confronted with these realities, the respondent explored the possibilities of merger, sale of all of its assets to some other company, continued operation of both Utica and Andrews plants, and the liquidation of the Utica plant and continued operation of the Andrews plant. An extensive examination of the possible alternatives demonstrated the impracticability of the first three courses. The management, having been convinced that its business could be profitably conducted at Andrews with the production of a reasonably limited number of styles, determined to cease production at the Utica plant and to transfer to Andrews all potentially profitable production. It had become apparent that the demand for heavyweight items such as men’s heavy-weight union suits and men’s heavy-weight shirts and drawers had greatly diminished, and that sweat shirts could not be sold at a price adequate to cover respondent’s cost of production and sales. It was believed, however, that acceding to the current market, T-shirts, lightweight shirts and drawers, and certain outerwear could be profitably produced. In September of 1954, the management began to halt Utica production and to liquidate its inventory. Appropriate machinery, equipment and raw materials were transferred to the Andrews plant, and the remaining Utica machinery and equipment were offered for sale. Much of the machinery offered for sale was that previously required for the production of the discontinued items, and for materials and processes which could presently be purchased or contracted for more economically on the open market. The retention of this equipment in standby condition would unquestionably have resulted in its obsolescence.
A special meeting of stockholders was called for November 12, 1954, to consider among other matters a proposal that respondent’s Utica real property and such of its Utica machinery and equipment as the management might deem advisable be sold or leased. The petitioners duly filed objections to this proposal and demanded appraisal of their stock. Although eoncededly it would have been possible to obtain approval of two thirds of the voting stockholders for this proposal, it was not presented at the stockholders’ meeting. The management, upon the advice of counsel, believing that the consent of the stockholders was unnecessary, proceeded to wind up production at Utica, transfer usable machinery and equipment to the Andrews plant, and to sell or offer for sale the balance of the *820 Utica equipment. However, in March of 1955, authorization for sale or lease of the real estate was sought as a possible requirement in law or by prospective purchasers or lessees, and was duly obtained. The petitioners have protected their position and are before the court on two motions for the same relief. Except for the petitioners’ claim of an admission by inference, it is conceded that the basic issue remains unchanged.
On December 31,1954, audited balance sheets showed respondent’s capital as $1,600,000 and its net worth as $1,341,836.59, revealing an impairment of $258,163.41, despite the inclusion in the assets of the Utica real estate at a net book value of $252,085.71 and of the then unsold Utica machinery and equipment at a net book value of $199,747.30. Respondent, after the liquidation of substantially the entire Utica inventory as well as the liquidation of Utica machinery and equipment, having a net book value of about $297,000, owed the banks $350,000, and had other current liabilities of about $180,000, and a net working capital of approximately $521,000.
Section 20 of the Stock Corporation Law in substance requires the approval of two thirds of the stockholders entitled to vote if a corporation desires to sell or convey its property, rights, privileges and franchises, or any interest therein or any part thereof, if such sale, lease or exchange is not made in the regular course of its business and involves all or substantially all of its property, rights, privileges and franchises, or an integral part ¿hereof essential to the conduct of the business of the corporation. Section 21 of the same law prescribes the procedure to be followed by duly objecting stockholders. If, in view of the purposes and objects of a corporation, a particular sale may be regarded as within the regular and normal course of the business of the corporation and as not involving an integral part thereof, it is not within the purview of the statute. If the sale is such as to deprive the corporation of the means of accomplishing the ends for which it was incorporated; that is, if the business and assets sold were essential to the ordinary conduct of the business, it is within the statute.
The present controversy squarely poses the question of whether the conduct of the respondent was such as to bring it within the scope of section 20. The management of a corporation is entrusted to its board of directors. It is well established that the directors have power, in the ordinary course of business, to do any act permitted by the charter or certificate of incorporation. There is no serious suggestion that the actions of the board of directors were tainted by fraud, deceit or bad faith in any of the contested transactions. Although the statute has *821 been, held inapplicable to the actions of a corporation pursuing a business advantage (Matter of Leventall, 241 App. Div. 277) the courts have rarely been called upon to construe the applicability of its terms to the actions of a solvent corporation motivated by business conditions to pursue somewhat far-reaching measures in the manipulation of its assets in an effort to continue its business. (See 277 Park Ave. Corp. v. New York Cent. R. R. Co., 194 Misc. 417, affd. 275 App. Div. 1028, motion for leave to appeal to the Court of Appeals denied 276 App. Div. 757; 28 N.Y.U.L. Rev. 1014,1018.) If corporate management determines that a business is unprofitable, it may dispose of the property or business to eliminate further loss without the consent of its stockholders. (People v. Ballard, 134 N. Y. 269; Skinner v. Smith, 134 N. Y. 240; Raymond v. Security Trust & Life Ins. Co., 111 App. Div. 191.) The time-honored test to determine the need for stockholder consent “ is not the amount involved, but the nature of the transaction, whether the sale is in the regular course of the business of the corporation and in furtherance of the express objects of its existence, or something outside of the normal and regular course of the business.” (Matter of Timmis, 200 N. Y. 177, 181; Matter of Miglietta, 287 N. Y. 246, 254.) The instant transactions do not involve the investment of respondent’s assets in a substantially different business of a kind in which it was not authorized to engage, nor the exchange of its stock for the stock of another corporation, nor were they pro tanto going out of business in any vital department or branch of respondent’s business. (See Matter of Kunin [Title Guar. & Trust Co.], 281 App. Div. 635, affd. 306 N. Y. 967.) “ What in the instance of one corporation may be a sale or lease of all its assets requiring consent of stockholders, may, in the case of another corporation, depending upon its purpose, methods of operation and past history, and the industry practices and pattern, represent usual, normal and ordinary activity which does not require consent.” (Schreiber v. Butte Copper & Zinc Co., 98 F. Supp. 106, 111.) Respondent has shown that it has long been the custom in the knit goods industry in general and its own operations in particular to discontinue unprofitable production and to sell equipment and machinery no longer needed in the ordinary course of its business. Subsequent to 1920, respondent found it expedient to reduce the production of men’s and, particularly, women’s heavy-weight underwear, the volume of which had previously been much greater than the aggregate of all of its other production. This procedure constituted a normal operation of its business and was effected without specific stockholder approval. *822 Respondent’s present decision to concentrate upon the profitable production of light-weight underwear, T-shirts and outerwear would seem to be in accord with accepted business practice. Respondent has not relinquished any of its franchises nor has it prohibited itself from engaging in any branch of the knitted goods business which may now, or in the future, prove acceptable to consumers and profitable to it. None of the acts of the respondent can practicably be called acts of complete or partial self-destruction. It has not deprived itself of its ability to carry out its corporate purposes as exemplified in its amended charter by alienating an integral part of its business and has not altered the avowed purpose of the corporation— to manufacture, process, sell and otherwise deal in knit goods of any character. Since the charter further specifically provides that the corporate purpose is to do all acts and things as may be necessary, convenient or incidental to the foregoing, the board of directors may not be held to have acted in excess of their declared powers. (See Wattley v. National Drug Stores Corp., 122 Misc. 533, 535, affd. 208 App. Div. 836; Matter of Knaisch, 203 App. Div. 725, 728.)
The Fourth Department has recently indicated (Matter of Hake, 285 App. Div. 316) that a lease for a 10-year period of its New York property and the complete removal of a manufacturing corporation to Roanoke, Virginia, after the sale of certain personal property held to be obsolete and not needed at the new location was not a transaction outside the regular course of business of the corporation such as to give dissenting stockholders a right of appraisal. While the amount of property presently sold or offered for sale or lease was much greater than the amount there involved, the principle is analogous. It is thought that the transactions here are not of such character as to warrant the application of the statute. They did not involve an integral part of the business of the corporation and, under the peculiar circumstances confronting the respondent, were not calculated to affect injuriously the corporation, nor can they be considered as a practical dissolution or abnegation of its corporate purpose. It should be noted that production at Andrews may be easily expanded if condition should warrant, and that increased production is contemplated. As stated in Matter of Timmis (200 N. Y. 177,182, supra) we are called upon “simply to decide whether the facts of this case bring it within the sections under" consideration. ’ ’
Having determined that the provisions of section 20 have no applicability to the present situation, the converse problems of procedural differences in the disposition of the real and per *823 sonal property and the application of legal and equitable principles to the question of minority payment from impaired or necessary working capital have not been considered.
Respondent’s motion to conform its amended answer to the proof in all respects, and in particular to deny any allegations of the petitions that the sales in question were not made in the ordinary course of respondent’s business, and for a dismissal of the proceedings on the ground that on all of the evidence the petitioners have failed to show themselves entitled to the relief requested is granted.
Submit order.