**U.S. BANK NATIONAL ASSOCIATION, as Trustee, on behalf of Holders of 7–1/2% Senior Convertible Notes due 2003 of Angeion Corporation, Appellant,**

v.

**ANGEION CORPORATION, Respondent.**

Nos. C3–99–2080, C7–00–386.

Court of Appeals of Minnesota.

Aug. 15, 2000.

Judy A. Rogosheske, Michael H. Pink, Best & Flanagan LLP, Minneapolis, for appellant.

Therese M. Marso, Robert R. Weinstine, Steven C. Tourek, Winthrop & Weinstine, P.A., Minneapolis, for respondent.

Considered and decided by RANDALL, Presiding Judge, LANSING, Judge, and WILLIS, Judge.

## OPINION

LANSING, Judge.

This litigation involves the interpretation of an indenture. U.S. Bank, as trustee for Angeion Corporation noteholders, sued Angeion for defaulting on its obligation to make a repurchase offer to noteholders when it "conveyed, transferred, or leased all or substantially all of its assets or for injunctive relief." On cross-motions for summary judgment, Angeion disputed that its sale and license of patents triggered the repurchase obligation. The district court agreed and granted summary judgment for Angeion. Because we conclude that the sale and license of patents constitutes an asset transfer within the meaning of the indenture, we hold that U.S. Bank has raised genuine issues of material fact on its claim for breach of the indenture and that summary judgment was premature. We reverse and remand for further discov-ery. But because U.S. Bank has not demonstrated that it lacks an adequate legal remedy or that it will suffer irreparable harm, we affirm the district court's order denying U.S. Bank's temporary injunctive relief.

## FACTS

Angeion incorporated in 1986 to develop, manufacture, and sell medical products. Initially, Angeion used its engineering and manufacturing technologies to custom design and manufacture products to customers' specifications and devoted its research and development capabilities to designing proprietary products. In 1990, Angeion created a subsidiary to oversee intensified research into the development of laser catheter-ablation systems. The same year, Angeion acquired a company engaged in the development of implantable-cardioverter-defibrillator (ICD) systems.

Angeion sold its medical-accessory-products division in 1992 and focused its efforts on the development and production of the catheter-ablation and ICD systems. In 1997, Angeion entered into a joint venture with Synthelabo, a French pharmaceutical company, and its subsidiary, ELA Medical. In its 1998 annual–10–K report filed with the SEC, Angeion described itself as a company that designed, developed, and marketed ICDs and developed catheter-ablation technologies. Angeion ultimately developed a portfolio of about 150 patents and patent applications, including 99 U.S.-issued patents, 8 approved-but-not-yet-issued U.S. patents, and 17 pending patent applications. Through its own portfolio and through cross-licensing, Angeion had access to more than 1,000 patents.

In 1996, Angeion sued CPI and its subsidiary, Guidant, Inc., for infringing four of Angeion's ICD patents. CPI sued Angeion in September 1998 for infringement of several of its ICD patents.

In March 1998, Angeion issued a private-placement memorandum seeking sophisticated investors to buy the unsecured convertible notes that are at the base of this litigation. In April 1998, Angeion en-

tered into an indenture with U.S. Bank as trustee for noteholders who purchased Angeion's convertible notes in a private-placement offering. Angeion raised $22,150,000 through the 7½% convertible notes due in 2003.

The placement memorandum incorporated Angeion's 10–K for the fiscal year ending December 31, 1997, as well as recent quarterly reports and other documents filed with the SEC. The memorandum described Angeion as a company that designed, developed, manufactured, and marketed ICDs. The memorandum also disclosed risks of investment, including Angeion's continuing failure to make a profit, the uncertainty of FDA approval for its products, the need for additional financing, the impact of tough competition in the ICD market, the importance of intellectual-property protection, and the uncertain results of the patent litigation with CPI.

In September 1998, Angeion entered an agreement with Cordis Webster, under which it transferred to Cordis Webster a small number of U.S. patents, U.S. pending patent applications, and patent applications. All of the patents and applications dealt with catheter-ablation technology. In exchange, Angeion received cash, future royalties, and funding for continued research in the catheter-ablation field.

In January 1999, Angeion reduced its workforce by 20%, including a 40% reduction of senior management. Angeion took the action to reduce its $2.5 million monthly cash "burn rate."

On April 8, 1999, Angeion announced its intention to "limit its participation in the ICD marketplace in order to redeploy its resources toward opportunities which may result in greater shareholder value." Angeion stated it would "continue to explore strategic alternatives for the Company including potential license or sale of its assets." In connection with its withdrawal from the ICD market, Angeion reduced its workforce by another 75%, retaining only employees needed for ongoing operations and to meet existing ICD obligations.

That same day, Angeion announced a settlement of the CPI patent litigation. Under the terms of the settlement, CPI paid $35 million for past infringement and future licensing. Angeion granted CPI nonexclusive licenses for all of its ICD patents. CPI agreed not to sue Angeion for certain of its ICD product lines, and, in return, Angeion agreed to pay royalties for use of patents licensed to CPI.

On May 12, 1999, Angeion announced its withdrawal from its joint venture with ELA Medical. ELA Medical continued to distribute Angeion's products under a supply agreement.

In June 1999, U.S. Bank received a letter from one of the noteholders, alleging that Angeion was in default on the indenture because it had sold all or substantially all of its assets and had failed to make a repurchase offer. U.S. Bank sent a letter to Angeion inquiring about the status of the company and warning that it may be in default. In August 1999, U.S. Bank sent a notice of default to Angeion; Angeion denied that it had defaulted.

On September 17, 1999, Angeion announced its intention to grant Medtronic a non-exclusive license to all of its ICD patents and patent applications for $9 million. On September 23, 1999, Angeion announced its intention to acquire all outstanding shares of Medical Graphics, Inc., a cardiopulmonary medical-device company, for $16.3 million in cash.

On September 24, 1999, U.S. Bank filed suit in district court, alleging that Angeion was in default on the indenture because it had sold all or substantially all of its assets and had not made a repurchase offer. U.S. Bank sought specific performance, equitable relief, declaratory judgment, imposition of a constructive trust, and damages. U.S. Bank then moved for a temporary injunction preventing Angeion from depleting its cash reserves. Angeion counterclaimed, alleging, among other things, breach of contract and interference with prospective economic advantage.

The district court denied U.S. Bank's temporary-injunction motion, reasoning

that the balance of harm weighed against granting the injunction. Angeion then moved for summary judgment on all of U.S. Bank's claims. In turn, U.S. Bank moved for summary judgment on Angeion's counterclaims, and served interrogatories on Angeion. Angeion refused to answer the interrogatories, asserting that U.S. Bank's motion for summary judgment evidenced a concession that there were no material issues of fact and obviated further discovery. On February 9, 2000, U.S. Bank noticed a motion to compel discovery and Angeion noticed a motion for a protective order. Both motions were scheduled for hearing on February 23.

On February 22, the district court granted Angeion's motion for summary judgment. The court concluded that, as a matter of law, Angeion had not conveyed or transferred all or substantially all of its assets because the catheter-ablation patents were a small part of Angeion's intellectual-property portfolio and licensing of the ICD patent portfolio was not a conveyance, transfer, or lease of assets. The court reasoned that further discovery would be expensive and unnecessary.

U.S. Bank appeals both the entry of summary judgment and the denial of a temporary injunction.

## ISSUES

I. Did U.S. Bank raise a genuine issue of fact in support of its claim that Angeion defaulted on the indenture by conveying, transferring, or leasing all or substantially all of its assets and failing to make a repurchase offer on the notes?

II. Did the district court abuse its discretion by denying U.S. Bank's request for a temporary injunction to prevent Angeion from depleting its cash reserves?

## ANALYSIS

### I.

■ On appeal from summary judgment, we determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). The interpretation of indenture terms is essentially a question of contract law. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1049 (2d Cir.1982). Because the indenture contains a choice-of-law clause providing that New York law governs, we apply New York contract law to this dispute. *See Milliken & Co. v. Eagle Packaging Co.,* 295 N.W.2d 377, 380 n. 1 (Minn.1980) (stating court will enforce parties choice-of-law agreement.)

■ Under New York law, the objective in interpreting an indenture is to effectuate the intent of the contracting parties. *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985) (*citing Hartford Accident & Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907, 910 (1973)). The parties reasonable expectations and purpose serve as guideposts to determine intent. *Uribe v. Merchants Bank,* 91 N.Y.2d 336, 670 N.Y.S.2d 393, 693 N.E.2d 740, 743 (1998). If the terms of the indenture are plain and unambiguous, their interpretation is for the court. *Rothenberg,* 755 F.2d at 1019. If the language is susceptible to two or more reasonable interpretations, however, the interpretation of the contract creates an issue of fact and summary judgment may be inappropriate. *Id.*

The indenture obligates Angeion to make a repurchase offer on the notes if a "designated event" occurs. The indenture defines a designated event as a "change of control or termination of trading." And a change of control occurs when "the [c]ompany conveys, transfers or leases all or substantially all of its assets to any person." The dispute centers on whether Angeion has conveyed, transferred, or leased all or substantially all of its assets.

U.S. Bank alleges that five actions by Angeion collectively constitute a conveyance, transfer, or lease of all or substantially all assets: the September 1998 patent sale to Cordis Webster, the January 1999 workforce reduction, the April 1999 patent litigation settlement and patent licensing, the April 1999 workforce reduction, and the withdrawal from the joint venture with ELA Medical.

■ Although the two workforce reductions and the joint-venture withdrawal may demonstrate a shift in Angeion's business plan, these three actions indisputably do not convey, transfer, or lease assets. The district court correctly decided that as a matter of law these actions could not trigger an obligation to make a repurchase offer. The issue then narrows to whether Angeion's sale of its catheter-ablation patents in September 1998 and its licensing of the ICD patent portfolio in April 1999 constituted a conveyance, transfer, or lease of all or substantially all of its assets.

Angeion asserts that the licensing of its patents does not constitute a conveyance, transfer, or lease as a matter of law. We are not persuaded by this argument. Although "convey," "transfer," and "lease" have historical origins relating to real property, the plain meaning of each of the terms encompasses transactions involving tangible and intangible personal property. *See American Heritage Dictionary* 412 (3rd ed.1992) (defining "convey" as "transfer ownership of or title to"), 1900 (defining "transfer" as "[t]o make over the possession or legal title of; convey"), 1025 (defining "lease" as "[t]o grant use or occupation of under the terms of a contract"); *see also Black's Law Dictionary* 334 (7th ed.1999) (defining "convey" as "to transfer or deliver (something such as a right or property) to another"), 1503 (defining "transfer" as "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including the payment of money, release, lease, or creation of a lien or other encumbrance"), 900 (defining "lease" as "[t]o grant the possession and use of prop-

erty to another in return for rent or other consideration").

■ Although "convey" and "lease" have retained a closer connection to transactions involving tangible rather than intangible property, transfer "embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with an interest in property." *Id.* at 1503. In addition, the indenture's use of all three of the terms—convey, lease, and transfer—in the change-of-control clause evidences an intent to broaden, rather than limit, the circumstances constituting a change of control that would trigger the repurchase offer. *See Corhill Corp. v. S.D. Plants, Inc.,* 176 N.E.2d 37, 39 (N.Y. 1961) (preferring an interpretation that gives reasonable and effective meaning to all terms of the contract). For these reasons, we conclude that the plain meaning of the word "transfer" includes Angeion's action in granting nonexclusive patent licenses in exchange for cash.

Angeion alternatively asserts that a patent license as a matter of law cannot be an asset within the meaning of the indenture. Angeion does not seem to dispute that the patents themselves were assets. *See Cyrix Corp. v. Intel Corp.,* 803 F.Supp. 1200, 1207 (E.D.Tex.1992) (recognizing acquisition of rights under patent licenses as valuable asset). Rather, it argues that the non-exclusive licensing of the patents did not constitute a transfer of assets because Angeion retained ownership of the patents and was not restricted from using them.

We recognize that the federal courts have in some circumstances distinguished patent licenses from assets. *See, e.g., First Nat'l Trust & Savs. Bank v. United States,* 200 F.Supp. 274, 282 (S.D.Cal.1961) (holding that transfer of nonexclusive patent license was not transfer of capital asset under internal revenue laws). Federal cases have also held that a nonexclusive patent license does not pass title to the patent. *See, e.g., Jim Arnold Corp. v.*

*Hydrotech Sys., Inc.,* 109 F.3d 1567, 1577 (Fed.Cir.1997) (nonexclusive patent license is contract and does not pass title to the patent). But our interpretation of the indenture between U.S. Bank and Angeion is governed not by federal cases interpreting federal statutes in distinguishable circumstances, but rather by the intent and the reasonable expectations of the parties to the indenture, as evidenced in the plain meaning of the indenture.

Again, we find nothing in the plain meaning of "asset" that excludes the sale or license of the patents. Asset is broadly defined as "a useful or valuable quality, person, or thing; an advantage or a resource." *American Heritage Dictionary, supra,* at 111; *see also Black's Law Dictionary, supra,* at 112 (defining asset as "[a]n item that is owned and has value"). Angeion's interpretation would limit a "transfer of assets" to a change of full ownership. This reading not only makes "transfer" meaningless as a duplication of "convey," but also overlooks the law's long history of recognizing that property rights are divisible and may be transferred divisibly. *See* Restatement of Property § 13 cmt. a (1936) (transfer "may be either of one or more specified interests or of an aggregate of interests").

 The transfer of property rights may include the right to possess, the right to use, or the right to exclude. *Id.* (describing transfer as a two-step process that first "extinguishes" the right in the transferor and then, "insofar as the interests thus extinguished are interests good against others than the transferee," creates the similar interest in the transferee). When Angeion granted CPI non-exclusive licenses, it transferred one of the divisible rights in its bundles of patent rights. After the license, Angeion no longer had the right to exclude CPI from using its patents and, conversely, CPI had the right to use Angeion's patents without being sued for infringement. We conclude that this transfer of value from Angeion to CPI, at a minimum, raises a genuine issue of fact regarding whether Angeion transferred assets within the meaning of the indenture.

To conclude otherwise would render the indenture language practically meaningless in the context of a company like Angeion, whose primary asset is intellectual property. Under Angeion's urged application of the indenture language, the company would be allowed to cross-license its patents until it retained no practical ability to exclude competitors. As long as it did not sell its patents altogether, Angeion would be in no danger of triggering its obligation to repurchase the notes. We are not persuaded that an extensive licensing scheme is any less within the meaning of the indenture than the outright sale of the patents.

 To prevail on its claim that Angeion's transfer of assets triggered the requirement to make a repurchase offer, U.S. Bank must also demonstrate that Angeion transferred all or substantially all of its assets. "The words 'all or substantially all' are used in a variety of statutory and contractual provisions relating to transfers of assets and have been given meaning in light of the particular context and evident purpose." *Sharon Steel,* 691 F.2d at 1049 (citations omitted).

Only two published cases have interpreted the words "all or substantially all" in the context of an indenture. The first, a Delaware case interpreting Pennsylvania law, held that the sale of 75% of a corporation's assets—stock in another company—was a sale of all or substantially all of the corporation assets because of the high percentage of total assets and because it was the corporation's only substantial income-producing asset. *B.S.F. Co. v. Philadelphia Nat'l Bank,* 204 A.2d 746, 750 (Del. Supr.Ct.1964). Reasoning that the notes were unsecured debt and that the indenture's limitations were the only security afforded to the noteholders, the court emphasized the qualitative nature of the sale and considered the noteholder's intentions

and the goal of protecting the asset from dissipation. *Id.*

The second case, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* interpreted a successor-obligor clause that permitted the corporation to transfer its obligations on some notes to a corporate successor that bought all or substantially all of its assets. 691 F.2d at 1044–45. The court applied a quantitative analysis, reasoning that the transferred assets did not constitute all or substantially all of the assets because the assets accounted for only 38% of operating revenues, 13% of operating profits, and 41% of the corporation's book value at the time of the indenture. *Id.* at 1051. Because the court did not regard the question "as even close," it did not determine how it would measure the substantiality of corporate assets, what percentage meets the "all or substantially all" test, or what role a jury might play in determining those issues in a closer case. *Id.*

 Outside the indenture context, the "all or substantially all" language has been used for much of the 20th century in shareholder-protection statutes. *See, e.g., In Re Avard,* 144 N.Y.S.2d 204, 208 (N.Y.Sup.Ct.1955) (interpreting shareholder-protection statute). Shareholder-protection statutes prohibit a corporation from selling all or substantially all of its assets without shareholder approval. *See id.* at 204 (citing New York statute); *Winston v. Mandor,* 710 A.2d 835, 838 (Del.Ch. 1997) (citing Delaware statute). The authorities differ on whether courts' interpretation of these statutes is relevant to interpreting similar language used in indentures. *Compare B.S.F.,* 204 A.2d at 750 ("this question is not necessarily to be answered by references to the general law concerning the sale of assets by a corporation"), *with Cyrix Corp.* 803 F.Supp. at 1211 ("[e]xisting laws become a part of a contract") (citation omitted). Because the shareholder-protection statutes have identical language and a similar purpose, we conclude that these interpretations may

have affected the parties' understanding at the time they entered the indenture and thus are relevant to intent and reasonable expectations.

New York courts first addressed the "all or substantially all" language in a shareholder-protection statute in *Avard.* The court interpreted a statute that required approval of two-thirds of a corporation's shareholders before that corporation could sell or convey all or substantially all of its property, rights, privileges and franchises or an integral part essential to conduct of the business if the transaction was not made in the regular course of business. 144 N.Y.S.2d at 208. The court evaluated qualitative factors in applying the statute and determined that the need for shareholder consent depended not only on the amount involved, but also on the nature of the transaction. *Id.* at 209. Thus, *Avard,* applying the language of the statute, adopted a qualitative approach to applying the all-or-substantially-all language.

New York courts have in other cases applied a more quantitative approach in determining whether a corporation has sold all or substantially all of its assets. *See* Harry Rubin & Marcus D. Wilkinson, *The Meaning of "Substantially All" of a Corporation's Assets,* Insights, July 1991, at 12. For instance, in *Story v. Kennecott Copper Corp.,* 394 N.Y.S.2d 353 (N.Y.Sup. Ct.1977), the court rejected the argument that a corporation sold all or substantially all of its assets by selling its only income-producing assets. *Id.* at 354. Noting that the shareholder-protection statute had been amended since *Avard* to delete shareholder approval for the sale of assets constituting an "integral part" of the total business, the court held, without identifying the percentage of assets sold, that the amount did not meet the "all or substantially all" requirement. *Id.* at 354–55.

Angeion argues that the persuasive effect of the cases interpreting the New York statute is minimal because the statutory language includes the additional re-

quirements of "not in the usual course of business" and "integral part of the corporation's business." These elements, however, were imposed at common-law even before they were codified. The common-law rule was that a corporation could not "sell all its property, or even a part thereof so integral as to be essential for the transaction of its ordinary business," because it resulted in a practical dissolution. *In re Timmis*, 93 N.E. 522, 523 (N.Y. 1910). The qualitative aspects of the common-law rule also were evident in early interpretations of the shareholder-protection statute and formed a part of the analysis to determine what constituted "all or substantially all" before the statute specifically incorporated those aspects. *See id.*

The Delaware cases interpreting the "all or substantially all" language confirm that the language itself may impose a qualitative inquiry. Delaware's shareholder-protection statute requires shareholder approval before a corporation may "sell, lease or exchange all or substantially all of its property and assets," and does not include the "usual course of business" language. *Winston*, 710 A.2d at 838 (quotation omitted). Most recently in *Winston v. Mandor*, the Delaware Court of Chancery considered both qualitative and quantitative aspects of a transaction in determining whether a corporation's sale of its only income-producing assets (amounting to 60% of its assets) is a sale of all or substantially all of its assets that requires shareholder approval. *Id.* at 843; *see also Gimbel v. Signal Cos.*, 316 A.2d 599, 606–07 (Del.Ch.1974) (considering both quantitative and qualitative aspects of asset transaction).

■ Applying New York law and persuasive authority from other jurisdictions interpreting the "all or substantially all" language, we conclude that whether Angeion transferred all or substantially all of its assets depends upon both the quantitative and the qualitative nature of the asset transfer. In some cases, a transfer of assets may be so quantitatively insignifi-

cant that an inquiry into the qualitative nature of the transfer is unwarranted. *See, e.g., Sharon Steel*, 691 F.2d at 1051. In other cases, however, a transfer that is moderate when judged quantitatively may still affect all or substantially all of a corporation's assets because of its qualitative impact on the corporation. *See, e.g., Winston*, 710 A.2d at 843. Thus, in many cases, applying the "all or substantially all" language will require consideration of both the quantitative and the qualitative nature of the asset transfer.

■ The district court, because of its conclusion that granting a patent license was not a transfer of assets, considered only whether the sale of the catheter-ablation patents was a transfer of all or substantially all of Angeion's assets. Because we have concluded that licensing of the ICD patent portfolio constitutes an asset transfer within the meaning of the indenture, we must consider the second part of the question: whether the ICD patent licensing, in conjunction with the sale of the catheter-ablation patents, was a transfer of all or substantially all of Angeion's assets.

After a thorough review of the record, we conclude that summary judgment was premature. Applying either a quantitative or a qualitative analysis, the record is not sufficiently developed for a determination whether Angeion transferred all or substantially all of its assets. U.S. Bank has not alleged, and Angeion has not disclosed, what percentage of operating revenue, operating profit, or book value the patents represented. Without this information, it is nearly impossible to weigh any of the factors that have been used by the courts to determine whether a corporation has transferred all or substantially all assets.

■ To survive summary judgment, the nonmoving party generally has the burden to show that a genuine issue of fact exists. *W.J.L. v. Bugge*, 573 N.W.2d 677, 680 (Minn.1998). But when the nonmoving party has been allowed only minimal discovery and the information that party

needs to survive summary judgment is in the moving party's sole possession, summary judgment may be premature. *See Costello, Porter, Hill, Heisterkamp & Bushnell v. Providers Fidelity Life Ins. Co.*, 958 F.2d 836, 838–39 (8th Cir.1992); *Hennepin Broad. Assocs. v. American Fed'n of Television & Radio Artists*, 301 Minn. 508, 511, 223 N.W.2d 391, 394 (1974). The "[r]elative availability of evidence to the parties is a circumstance to be considered in determining what should be required for making a submissible case." *Spencer v. Kroger Co.*, 941 F.2d 699, 704 (8th Cir.1991) (quotation omitted).

All of the information U.S. Bank needed to demonstrate a material issue of fact on whether Angeion transferred "all or substantially all" of its assets was within Angeion's possession. Further, very little discovery had been conducted prior to the parties' summary-judgment motions, and Angeion refused to answer further discovery while the motions were pending. The record consists primarily of Angeion's financial reports to the SEC, along with its press releases, the depositions of the trustee and Angeion's former CEO, and a handful of affidavits. On this record, we conclude that summary judgment was premature. Our ruling does not preclude Angeion from renewing its motion for summary judgment or the district court from granting that motion after further discovery has been conducted. *See Hennepin Broad. Assocs.*, 301 Minn. at 511, 223 N.W.2d at 394 ("[i]t may very well be that plaintiff will be unable to produce sufficient evidence to withstand a later motion for summary judgment made after all discovery has been completed").

## II.

■ The district court may grant a temporary injunction if affidavits, deposition testimony, or oral testimony demonstrate sufficient grounds. Minn. R. Civ. P. 65.02(b). The party seeking the injunction must demonstrate that there is an inadequate legal remedy and that the injunction is necessary to prevent great and irreparable injury. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 91 (Minn.1979); *see also Dahlberg Bros. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321 (1965) (listing considerations for determining whether temporary injunction appropriate). The district court has broad discretion to grant or deny a temporary injunction, and we will reverse only for abuse of that discretion. *AMF Pinspotters, Inc. v. Harkins Bowling, Inc.*, 260 Minn. 499, 504, 110 N.W.2d 348, 351 (1961).

■ Relying on a U.S. Supreme Court case, *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), Angeion argues that a temporary injunction is unavailable regardless of whether U.S. Bank can show irreparable injury. In *Grupo Mexicano*, the Supreme Court held that a district court may not, under Fed.R.Civ.P. 65, issue a preliminary injunction prohibiting asset depletion in favor of a party seeking only money damages on a contract claim. *Id.* at 333, 119 S.Ct. at 1975. The court concluded that such an injunction was tantamount to a prejudgment attachment, which was not allowed at common-law. *See id.* at 319, 119 S.Ct. at 1968 (creditor's bill could only be brought by creditor who had already obtained a judgment). Although the Supreme Court's holding on the jurisdiction of the federal district courts does not control Minnesota courts' authority to issue injunctions, the analysis is persuasive and consistent with Minnesota law.

We disagree with U.S. Bank's argument that its claims on constructive trust, specific performance and declaratory judgment create a distinction that makes the *Grupo Mexicano* analysis inapposite. *See United States ex. rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir.1999) (reasoning that *Grupo Mexicano* applies only to pure money damages claims); *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 77 F.Supp.2d 199, 202 (D.Mass.1999) (lim-

iting *Grupo Mexicano* to cases where a plaintiff-creditor has no lien or equitable interests in defendant's assets).

U.S. Bank's constructive trust claim does not identify any specific property that in equity belongs to the noteholders nor does it assert any wrongful conduct in obtaining that property. *See Martin v. Tucker,* 217 Minn. 104, 106, 14 N.W.2d 105, 106 (1944) (declining to impose constructive trust because "record is barren of any proof of fraud, oppression, duress, undue influence, or any other wrongful conduct * * * necessary to create a constructive trust"). Further, U.S. Bank's claims for specific performance and declaratory judgment are not rooted in an equitable interest in U.S. Bank's assets and thus are not the type of equitable claim that the courts have excepted from *Grupo Mexicano*'s holding. *See Rahman,* 198 F.3d at 496–97 (stating that when plaintiff has no lien or equitable interest in property, plaintiff may not interfere with defendant's assets prior to judgment).

Applying Minnesota procedural law and the reasoning in *Grupo Mexicano,* we conclude that the district court did not abuse its discretion in denying the temporary injunction. U.S. Bank's complaint seeks declaratory relief and damages for failure to perform contractual obligations. U.S. Bank has not demonstrated that its requested relief will be inadequate without temporary injunctive relief. Neither has U.S. Bank demonstrated irreparable injury. Although Angeion may not maintain its large cash reserves, the cash will be replaced by other assets to which U.S. Bank may attach any judgment it receives. *See Allstate Sales & Leasing Co. v. Geis,* 412 N.W.2d 30, 33 (Minn.App.1987) (irreparable injury not shown just because party may spend money; money is fungible). Finally, as the district court emphasized, the harm that Angeion would have suffered under the requested injunction far outweighs any harm to the noteholders from the denial of the injunction. *See Dahlberg,* 272 Minn. at 274–75, 137 N.W.2d at 322 (stating that courts should consider relative harm to each party).

U.S. Bank's argument that it will suffer irreparable injury because Angeion is depleting its cash reserves and no cash will remain to satisfy a judgment is not an argument for injunctive relief, but for a prejudgment security interest or attachment. Attachments are governed by statute in Minnesota and are available only in limited, specified circumstances. *See* Minn.Stat. § 570.02, subd. 1 (1998); *see also Allstate Sales,* 412 N.W.2d at 32–33 (attachment statute appropriate remedy for party seeking prejudgment interest in property). We note that Minnesota cases have sometimes addressed injunctive relief and attachment interchangeably, but we have not allowed injunctive relief that creates a prejudgment security interest when attachment would not be allowed under the statute. *See Howe v. Howe,* 384 N.W.2d 541, 543, 545–46 (Minn.App.1986) (holding that district court did not abuse its discretion by granting temporary injunction to prevent asset depletion when plaintiff claimed assets were fraudulently obtained); *see also* Minn.Stat. § 570.02, subd. 1(4) (allowing attachment when "respondent has committed an intentional fraud giving rise to the claim upon which the civil action is brought"). The district court did not abuse its discretion by denying a temporary injunction.

## DECISION

The record is insufficiently developed to support summary judgment on whether Angeion breached its obligation to make a repurchase offer to noteholders because it transferred all or substantially all of its assets. Because summary judgment was premature, we reverse and remand for further proceedings. We affirm the district court's denial of a temporary injunction.

**Affirmed in part, reversed in part, and remanded.**