Ruby E. NELSON, Respondent,

v.

Marlin NELSON, Appellant.

No. 49207.

Supreme Court of Minnesota.

Aug. 17, 1979.

Erickson, Casey & Erickson and Carl E. Erickson, Brainerd, for appellant.

Breen & Person and Richard H. Breen, Brainerd, for respondent.

Heard by TODD, SCOTT, and MAXWELL, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This action was commenced by Ruby Nelson to recover for injuries she received in a single-car accident when riding as a passenger in a vehicle driven by her husband, Marlin Nelson. The jury found against Mr. Nelson and assessed Mrs. Nelson's damages at $70,000. Judgment was entered accordingly by the Itasca County District Court on June 27, 1978, from which Mr. Nelson now appeals. We affirm.

The accident occurred on Saturday, May 15, 1976, at approximately 7 p. m. This was the opening day of the 1976 fishing season and the Nelsons were returning from Marcell, Minnesota, to their cabin on Big Turtle Lake in Itasca County. Ruby and Marlin had arrived at their cabin late Friday afternoon, May 14, 1976, and were joined by

their sons, Barry and Donald, and Donald's fiancee later that evening.

The evening preceding the accident, Ruby Nelson retired for the night at approximately 11 p. m., but Marlin and Barry sat up until 4 a. m. By the time they went to bed they had consumed a quart of whiskey and a case of beer. Notwithstanding the activities of Friday evening and the fact that he had worked all of the preceding Thursday night, sleeping only for three or four hours Friday morning,[1] Marlin Nelson arose at 6 a. m. Saturday morning. He spent the morning smoking fish and then joined his sons in fishing during the afternoon. Marlin and Barry took a pint of whiskey and a 12-pack of beer with them onto the lake, but the record is unclear as to exactly what was consumed by each. In any event, Barry testified that Marlin was in "fine" condition when he left the lake.

While they were fishing, the motor on the boat had malfunctioned and Marlin decided to drive into Marcell to purchase new sparkplugs. He asked Ruby to accompany him. Before leaving, and in Ruby's presence, Marlin had a shot of whiskey. The 4-mile trip into Marcell was uneventful, and Ruby testified at trial that she noticed nothing extraordinary about Marlin's driving. In Marcell they purchased sparkplugs and had a beer with friends. They left to return to their cabin at approximately 7 p. m.

They left Marcell on Highway No. 286, the same road they had come in on. Approximately 1½ miles outside of town, the Nelson's pickup truck swerved off the right side of the blacktop highway at a place where the shoulder was 6 to 9 inches below the road surface. Marlin reacted to this by sharply turning the wheel to the left, possibly causing the steering mechanism to break, and sending the truck across the road and into a tree in the left ditch. The truck flipped onto its right side, and Ruby Nelson sustained a fracture of the odontoid process of her neck. At trial Ruby testified that, up until the point where the vehicle

---

1. Up until the time of the accident, Marlin Nelson held two jobs. He worked full time for the Crosby Manufacturing Company as a press operator on the 11 p. m. to 7 a. m. shift. In addition, he maintained a business as a chiropractor from 1 to 5 p. m. each weekday.

left the road, there had been nothing unusual about Marlin's driving.

At the site of the accident the road was straight and dry. There was little traffic and it was still daylight. Although there was a dip in the road, Marlin testified that he had traveled over it approximately 500 times and was well aware of its existence. Marlin further testified that he felt that he was in control of the vehicle up until the accident, but admitted that he may have lost control because of his lack of sleep and consumption of alcohol.

As they lay in the vehicle waiting for help to arrive, Marlin instructed Ruby to state that she had observed a deer jump onto the highway and. that the accident resulted when Marlin swerved to avoid it. They agreed to this story out of fear that Marlin might lose his insurance coverage and be subject to criminal charges. At their depositions in connection with this case, however, they admitted that the deer story was a sham. Likewise, they denied the existence of a deer at trial.

The issues for our determination are:

(1) Did the trial court err in finding that Ruby Nelson was not contributorily negligent?

(2) Did the trial court err in refusing to instruct the jury on the basis of the "emergency rule"?

(3) Are the damages awarded by the jury excessive?

1. In his answer, Marlin Nelson raised the defense of contributory negligence. At the close of the testimony, however, the court denied defendant's request for an instruction relating to contributory negligence and instructed the jury that " * * * under the evidence of this case there is no issue as far as any negligence on the part of Mrs. Nelson, Ruby Nelson." Marlin Nelson claims that this constitutes reversible error.

■ The issue of a passenger's contributory negligence is a limited one. See, *Young v. Wlazik,* 262 N.W.2d 300 (Minn. 1977); *Rahja v. Current,* 264 Minn. 465, 119 N.W.2d 699 (1963). As was summarized by this court in *Young v. Wlazik, supra:*

"A passenger in an automobile assumes a duty not to ride with an incompetent driver, not to obstruct the driver, and to warn the driver of hazards which (1) he perceives and (2) he has reason to believe his driver does not perceive. He is under no other duties." 262 N.W.2d 307.

While normally the question of contributory negligence is one for the jury, in those cases where " * * * different minds can reasonably arrive at but one result," the issue becomes one for the trial court to decide. *Stenzel v. Bach,* 295 Minn. 257, 259, 203 N.W.2d 819, 821 (1973).

■ Defendant claims that Ruby was negligent in that she chose to ride with an intoxicated driver. We have recognized, however, that the driver's intoxication would have to be evident to the passenger before he could be found contributorily negligent. *Tanski v. Jackson,* 269 Minn. 304, 130 N.W.2d 492 (1964).

Here, Ruby had no knowledge that Marlin had stayed up drinking until 4 a. m. Saturday morning. Nor did she see Marlin drink anything Saturday morning. Although she knew that he customarily drank while he was fishing, she had no actual knowledge that he took intoxicating beverages with him that Saturday afternoon. Moreover, Marlin did not appear intoxicated to his son, nor did anything about his driving on the way to Marcell put Ruby on notice that he was intoxicated or under the influence of alcohol. And finally, the defense did not present any evidence from persons who saw Marlin in Marcell, the investigating officers, or the treating physician which tended to show that Marlin was visibly intoxicated. Accordingly, the trial court correctly negated a finding of contributory negligence on Ruby Nelson's part.

■ Defendant does not so much dispute this evidence as he argues that a different result is compelled by this court's opinion in *Beaudette v. Frana,* 285 Minn. 366, 173 N.W.2d 416 (1969). It was in *Beaudette* that this court abrogated the defense of interspousal immunity. Defendant relies

on dicta in that opinion wherein the court commented that:

"The risks of negligent conduct are likewise so usual that it would be an unusual case in which the trial court would not instruct the jury as to the injured spouse's peculiar assumption of risk." 285 Minn. 373, 173 N.W.2d 420.

It is defendant's contention that this language mandates that in all interspousal litigation the issue of the spouse's contributory negligence always be submitted to the jury.

We must, of course, reject this argument. Here the record is void of any evidence from which the jury could find negligence on Ruby Nelson's part. To nevertheless submit that issue to the jury based on defendant's construction of *Beaudette* would serve only to pervert the trial process and perpetuate a vestige of the discarded doctrine of interspousal immunity. Accordingly, we decline to adopt a special rule requiring the automatic submission of contributory negligence claims in interspousal litigation.

■ 2. On the basis of the Nelsons' statements at the scene of the accident that they had swerved to avoid a deer, defense counsel requested that the court include the "emergency rule"[2] in its instructions to the jury. The trial court refused to give the instruction and, on appeal, defendant claims that this entitles him to a new trial. This claim is without merit.

In refusing to instruct on the basis of the emergency rule, the trial court reasoned as follows:

"I refused to give the emergency rule, Jury Instruction Guide 110. The only possible basis for the rule would be the statements made by both parties after the accident to the effect that a deer had come onto the highway and was the cause of defendant's vehicle leaving the highway.

"The unfortunate automobile accident occurred on State Highway No. 286, which is an absolutely straight, level tarvia stretch of road between Marcell and Talmoon. Photostats of photographs demonstrated a dip which was filled after the accident with a tarvia patch and a rather severe drop from the tarvia to the gravel shoulder. There was no evidence whatever that the shoulders or ditches adjacent to the highway were such as to prevent a motorist from seeing a deer long before the deer reached the highway. Defendant had been drinking, substantially more than his wife knew about, and it is hardly unusual that he would suggest the deer story as an excuse for his automobile leaving the highway. It was broad daylight and even had there been a deer, any emergency thereafter resulting would, in my opinion, be at least partially caused by defendant's lack of sleep, his drinking, and his driving.

"However, I do not believe that the deer story was entitled to any weight whatsoever. I permitted the entire matter to come out in the evidence for purposes of testing the credibility of both parties. Both explained rather satisfactorily the basis for the story, and their reasons for denying the story once they were sworn at the time of their depositions. Finally, I am convinced that the submission of the emergency rule would never possibly have changed the final result."

We agree with this reasoning and hold that the trial court was correct.

■ Both below and at oral argument, defense counsel has implied that the withdrawal of the deer story evidences collusion between plaintiff and defendant. We, like other courts, have recognized the possibility of collusion in interspousal actions. See, *Beaudette v. Frana, supra; Rogers v. Yellowstone Park Co.*, 97 Idaho 14, 539 P.2d 566 (1975); *Dietz v. Hardware Dealers Mutual*

---

2. The "emergency rule" provides as follows: "A person confronted with an emergency through no negligence of his own who, in an attempt to avoid the danger, does not choose the best or safest way, is not negligent because of such choice unless the choice was so hazardous that a reasonable person would not have made it under like circumstances." 4 Minnesota Practice, Jury Instruction Guides, JIG 110 G–S.

*Fire Insurance Co.*, 88 Wis.2d 496, 276 N.W.2d 808 (1979). However, instead of saddling such suits with a presumption of fraud *ab initio*, we have trusted the judicial process to detect and dismiss collusive actions. Here, the trial court observed the entire trial, carefully studied the demeanor of the witnesses, and then concluded that the deer story was a sham from its inception. Consequently, we are satisfied that counsel's fear of collusion is ill-founded.

■■ 3. Finally, defendant argues that the jury's verdict of $70,000 is excessive. He raised this issue before the trial court as part of his post-trial motion. Relief was denied, the court concluding that, "I personally felt and feel that the verdict was modest, considering the extent of the injuries." It is well settled that the trial court has broad discretion in determining whether a new trial should be granted for excessive damages and that its ruling on this point will only be disturbed for a clear abuse of discretion. E. g., *Bigham v. J. C. Penney Co.*, 268 N.W.2d 892, 898 (Minn.1978); *Lambertson v. Cincinnati Corp.*, 257 N.W.2d 679, 684 (Minn.1977). Based on the evidence adduced at trial, the trial court was well within its discretion in refusing to reduce the verdict.

When the pickup left the road, Ruby bounced forward and hit her head against the top of the cab. This resulted in a fracture of the odontoid process of her neck.[3] She was taken by ambulance to the hospital and placed in traction for two days.[4] The traction was extremely painful, and she required constant pain medication while in the hospital. She was transferred from the hospital in Bigfork to one in Crosby and then, on Memorial Day, was brought down to the University of Minnesota Hospital by ambulance.

Mrs. Nelson was treated at University Hospital by Dr. Roby Thompson, who placed her in a body and halo cast. This involved bolting a hoop into her skull and then anchoring the hoop to a plaster cast which covered her from shoulders to hips. She remained in the cast for 4 months. This apparatus severely restricted her movements and caused her great pain.

Upon removing the cast, Dr. Thompson learned that there had been no solid bony union of the fracture. He testified that, without surgery,[5] this will never heal. Additionally, since the cast has been removed, Mrs. Nelson has experienced a constant numbness in the back of her head and continual pain. She is hampered in her normal activities and has difficulty driving and sleeping. In fact, she testified that, since the accident, she has not been able to sleep more than 2 hours without being awakened by pain.

At the time of trial, Mrs. Nelson was 46 years old and thus had a life expectancy of 32 years. Dr. Thompson testified that, if she were ever to receive another injury similar to that received in the accident, it could well result in death or permanent paralysis. Moreover, there was evidence as to a considerable loss of earnings resulting directly from the injuries she received in the accident. Based upon this overwhelming evidence, the verdict was well within acceptable limits.

Affirmed.

PETERSON, Justice (concurring specially).

Although I concur with some misgiving in the result, it is one which suggests on its face that the concerns expressed in *Beaudette v. Frana*, 285 Minn. 366, 173 N.W.2d 416 (1979), were real.

---

**3.** The odontoid process is a tooth-like projection on which one of the cervical spines rests and the skull rotates.

**4.** At trial, defendant alleged that Mrs. Nelson's fracture resulted from this traction, not the accident. Dr. Roby Thompson, however, testified that this was "very unlikely."

**5.** As of the time of trial, plaintiff had not decided whether or not she would undergo this surgery.