STATE of Minnesota by its Attorney General, Lori SWANSON, Respondent,

v.

INTEGRITY ADVANCE, LLC, Appellant.

No. A13–1388.

Court of Appeals of Minnesota.

March 31, 2014.

Review Granted June 17, 2014.

Lori A. Swanson, Minnesota Attorney General, Nathan Brennaman, Assistant At-

torney General, St. Paul, MN, for respondent.

Scott A. Benson, Mark J. Briol, Briol & Associates, P.L.L.C., Minneapolis, Minnesota; and Katten Muchin Rosenman, Claudia Callaway (pro hac vice), LLP, Washington, D.C., for appellant.

Considered and decided by
HALBROOKS, Presiding Judge;
SCHELLHAS, Judge; and KLAPHAKE, Judge.

## OPINION

KLAPHAKE, Judge.[*]

Appellant payday lender challenges the district court's grant of summary judgment in favor of respondent state in this consumer-enforcement action that resulted in a $7.76 million award. Appellant argues that (1) genuine issues of material fact exist that preclude summary judgment on whether appellant's payday loans caused harm to Minnesotan borrowers and on whether such borrowers were located in Minnesota; (2) the Dormant Commerce Clause of the United States Constitution precludes application of Minn.Stat. §§ 47.60 and 47.601 (2012) to appellant's lending activities; (3) the district court's award of statutory and civil damages was excessive and grossly disproportionate; and (4) the district court lacked a proper legal basis for enjoining appellant's lending activities in Minnesota. Because no genuine issues of material fact exist, application of Minnesota law does not violate the Dormant Commerce Clause, and the district court did not abuse its discretion in awarding damages and enjoining appellant's lending activities, we affirm.

## FACTS

Appellant Integrity Advance, LLC (Integrity), a Delaware limited liability company, is an online payday lender, operating through its website, https://www.iadvancecash.com. Integrity does not have a license to operate as a lender in Minnesota. In early 2010, the Minnesota Attorney General's office received complaints after Integrity made online payday loans to Minnesotans. The state notified Integrity of the complaints and demanded that Integrity disclose the number of payday loans it made in Minnesota. Integrity denied making any payday loans to Minnesotans, claiming that its website prohibited Minnesota applicants from completing the online application. In response, the state advised Integrity that it had received specific complaints from Minnesotans who had received online payday loans from Integrity. Integrity again denied making loans to Minnesota residents, claiming that the complaints in question must relate to people who had previously lived in other states or had indicated on the loan application that they lived in another state.

The state sued against Integrity, alleging that Integrity violated the state's payday lending statutes, Minn.Stat. §§ 47.60 and 47.601, by charging annual interest rates as high as 1,369%; automatically "rolling over" the loans for extended periods; failing to have the required state license to operate as a payday lender in the state; and otherwise violating Minnesota law. Integrity moved to dismiss the state's claims and counterclaimed, arguing that application of Minnesota law to any online payday loans it made to Minnesotans violates the Dormant Commerce Clause and Due Process Clause of the United States Constitution. The district

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

court denied Integrity's motion, and this court denied Integrity's petition for discretionary review, noting that the district court's decision did "not appear to be questionable or involve an unsettled area of the law." *State v. Integrity Advance, LLC,* No. A12–0459 (Minn.App. April 17, 2012) (order). The parties proceeded with discovery, which revealed the facts stated below.

Integrity made 1,269 payday loans to borrowers who had indicated on their loan applications that they resided, worked, and banked in Minnesota. Integrity contacted the loan applicants at their homes in Minnesota shortly after they completed the online loan application, called applicants at their places of employment in Minnesota as part of the loan underwriting process, and contacted applicants' financial institutions in Minnesota to confirm that the applicants' paychecks were automatically deposited into their accounts. Integrity also routinely contacted Minnesota borrowers for a variety of other reasons, including to service loans and to collect on delinquent accounts. Integrity's business records indicate that it directed approximately 27,944 contacts to Minnesotans for the purpose of doing business in Minnesota. In addition to these contacts, Integrity deposited payday loans directly into Minnesota borrowers' bank accounts and engaged in more than 20,000 transactions withdrawing interest and principal from these accounts.

Integrity charged Minnesota borrowers annual interest rates of up to 1,369% on its payday loans. For first time borrowers who borrowed up to $500, Integrity charged $30 every two weeks per $100 borrowed. Under its auto renewal payment plan, which Integrity imposed on borrowers who did not pay off their loans within their first payments, Integrity withdrew this $30 fee every two weeks for a

period of eight weeks. In the tenth week, in addition to the $30 charge, Integrity withdrew $50 from the borrowers' accounts and applied it to the principal. Every two weeks, Integrity continued to take the accrued interest plus $50, which was applied to principal, from borrowers' accounts until the loan was paid off. For example, on a $500 loan, these terms resulted in borrowers paying $600 in interest after eight weeks, but the principal balance on the loan would remain unchanged. Thereafter, borrowers would pay $30 in biweekly interest for an additional 20 weeks and $50 in. withdrawals applied to the $500 principal. The effect of these loan renewals was that borrowers paid more than $1,400 in interest on a $500 loan and more than $2,000 in interest on a $700 loan. Borrowers were motivated to seek the payday loans because of existing financial hardship, and the loan terms trapped them in a downward cycle of debt. Some needed to borrow from one payday lender to pay off another, exacerbating their debt repayment problems.

The parties filed cross motions for summary judgment. Integrity did not argue that its payday loans complied with Minnesota law. Instead, Integrity asserted that its loans were consummated in Delaware and that the Dormant Commerce Clause and Due Process Clause of the United States Constitution prohibited the application of Minnesota law to the loans made to Minnesotans. Integrity also argued that a genuine issue of material fact existed as to whether Integrity made loans to Minnesotans. The district court granted summary judgment in favor of the state, enjoining Integrity from lending in Minnesota until it registers with the department of commerce, acquires proper licensing, and complies with state law, and awarding the state $705,308 in restitution, $7 million in statutory damages and civil penalties, and

reasonable costs and attorney fees. This appeal followed.

## ISSUES

I. Did Integrity show that a genuine issue of material fact exists precluding a grant of summary judgment to the state?

II. Does the Dormant Commerce Clause preclude application of Minn.Stat. §§ 47.60 and 47.601 to payday loans Integrity made to Minnesotans?

III. Did the district court abuse its discretion in awarding $7 million in civil and statutory damages?

IV. Did the district court abuse its discretion in granting an injunction?

## ANALYSIS

The district court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Our role on appeal from summary judgment is well established:

> [W]e review whether there are any genuine issues of material fact and whether the district court erred in its application of the law. We view the evidence in the light most favorable to the party against whom summary judgment was granted. We review de novo whether a genuine issue of material fact exists. We also review de novo whether the district court erred in its application of the law.

*STAR Centers, Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76–77 (Minn.2002) (citations omitted). A genuine issue of material fact does not exist if the party opposing summary judgment merely offers evidence that "creates [only] a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997). "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.*

### I.

■ Integrity first argues that genuine issues of material fact exist as to whether Integrity's online payday loans caused harm to Minnesota borrowers and as to whether borrowers to whom Integrity extended online payday loans were actually located in Minnesota.

As to the harm Integrity's online payday loans caused to Minnesota borrowers, the state submitted numerous affidavits from Minnesota borrowers specifically describing the morass of debt they had fallen into as a result of the prohibitive interest rates associated with Integrity's loans. Integrity offered evidence, including a Federal Reserve Bank of New York staff report that generally highlights the benefits of short-term consumer loans, and an affidavit of Integrity's executive vice president attesting that Integrity's loans are mainstream financial products in high demand throughout the country. Integrity argues that this evidence creates a genuine issue of material fact for trial. This assertion is meritless.

Integrity's evidence does not refute or rebut the specifically articulated harm Minnesota borrowers suffered from Integrity's loans. The affidavit of Integrity's executive vice president contains no specific facts about the loans made to Minnesotans and merely contains conclusory statements about the general benefits of Integrity's financial products. Such conclusory statements are insufficient to defeat summary judgment. *Nowicki v. Ben-*

*son Props.*, 402 N.W.2d 205, 208 (Minn. App.1987). The Federal Reserve Bank of New York staff report contains similarly conclusory statements about the general benefits of short term loans and the socioeconomic consequences for states that have banned payday lending.[1] The report offers no evidence bearing on the facts of this case.

■ As to whether borrowers who received online payday loans from Integrity were located in Minnesota, Integrity produced the Internet Protocol address (IP address) of each computer used to complete an online loan application that provided a Minnesota address. To show that these borrowers were located in Minnesota, the state used an online IP lookup tool to verify the IP address associated with each Minnesota loan application. The results of the state's IP-address research were initially listed in a spreadsheet attached to an affidavit from an attorney for the state.

Integrity objected that the affidavit of the state's attorney (1) does not satisfy the Minn. R. Civ. P. 56.05 requirement that supporting affidavits must be made on personal knowledge, setting forth such facts that would be admissible in evidence and (2) violates the rules of professional conduct, which bar a lawyer who is acting as advocate from testifying on behalf of a client. *City of Duluth, St. Louis Cnty. v. P.F.L., Inc.*, 431 N.W.2d 135, 137 (Minn. App.1988) (holding as a matter of law that, under Minn. R. Civ. P. 56.05 and Minn. R. Prof. Conduct 3.7, an affidavit drafted by attorney, which contained only unverified "opinions," "beliefs," and "allegations," was inadequate to oppose summary judgment). Rather than dispute this point, the state filed the affidavits of three legal assistants who conducted the research on the bor-

rowers' IP addresses. While we conduct a de novo review of the district court's summary judgment decision, *McKee v. Laurion*, 825 N.W.2d 725, 729 (Minn.2013), "[w]e review a district court's evidentiary rulings, including rulings on foundational reliability, for an abuse of discretion," *Doe 76C v. Archdiocese of St. Paul*, 817 N.W.2d 150, 164 (Minn.2012). "[I]n addition to the pleadings, affidavits, and depositions, the [district] court in deciding a motion [for summary judgment] may consider . . . other material that would be admissible in evidence or otherwise usable at trial." *Lundgren v. Eustermann*, 370 N.W.2d 877, 881 n. 1 (Minn.1985). Here, the legal assistants performed the research, their affidavits are based on personal knowledge, and they would be competent to testify on the methodology used to verify the physical locations associated with borrowers' IP addresses. Consequently, the district court did not abuse its discretion by considering these affidavits.

To counter the state's research, Integrity, through its executive vice president, submitted a report obtained from an unnamed third party with which Integrity had contracted to run its own trace of the physical locations associated with borrowers' IP addresses. Integrity's report concedes that "45 percent of Integrity's borrowers who listed a Minnesota address on their loan applications were present" in Minnesota at the time they applied for a payday loan. But according to Integrity's report, the remainder of the IP addresses were associated with various locations around the country. Integrity argues that the discrepancy between its report and the state's research demonstrates a genuine issue of material fact as to whether Integrity extended payday loans to Minnesotans

[1]. Minnesota does not ban payday loans; it requires that lenders that extend payday loans to Minnesotans are properly licensed and comply with state laws. Minn.Stat. § 47.60.

and that the district court improperly weighed the evidence, deciding that the state's research was more credible. *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.,* 736 N.W.2d 313, 320 (Minn.2007) ("Weighing the evidence and assessing credibility on summary judgment is error.").

But the state accounted for this discrepancy by showing that Integrity's report did not provide the physical location associated with a borrower's IP address but rather provided the physical location of the headquarters for the internet service provider associated with the borrower's IP address. Thus, Integrity's report does not refute the state's evidence. Further, Integrity's report was prepared by an unnamed third party and used an unspecified methodology, and Integrity's vice president does not have personal knowledge to testify about the contents of the report. Minn. R. Civ. P. 56.05. Under these circumstances, the district court did not err in concluding that there are no genuine issues of material fact precluding summary judgment.

## II.

■ Second, Integrity argues that the district court erred in granting summary judgment to the state because the loans were consummated in Delaware, wholly outside of Minnesota's borders, and the Dormant Commerce Clause precludes application of Minn.Stat. §§ 47.60 and 47.601. We disagree.

■ The Commerce Clause states that "Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause represents an affirmative grant of power to Congress, it also implicitly prohibits states from enacting statutes that discriminate against or unduly burden interstate commerce. *Quill Corp. v. N.D. by Heitkamp,* 504 U.S. 298, 312, 112 S.Ct.

1904, 1913, 119 L.Ed.2d 91 (1992). This implicit negative command is known as the Dormant Commerce Clause. *Id.* at 309, 112 S.Ct. at 1911. It is well settled, however, that the Commerce Clause allows states to incidentally regulate aspects of interstate commerce when Congress has chosen not to legislate. *Great Atl. & Pac. Tea Co., Inc. v. Cottrell,* 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976). A state clearly may regulate "the consequences of commercial transactions on its citizens which arise or are directed from outside its borders." *Aldens, Inc. v. Ryan,* 571 F.2d 1159, 1161 (10th Cir.1978); *see Quik Payday, Inc. v. Stork,* 509 F.Supp.2d 974, 979 (D.Kan.2007) (relying on the analysis and rationale in *Aldens* to hold that, in regulating payday loans, "a state's regulation of the cost and terms on which its residents borrow money from an out-of-state creditor is not outweighed by the burdens on interstate commerce"), *aff'd,* 549 F.3d 1302 (10th Cir.2008).

Relying on a patchwork of inapposite cases, Integrity argues that because it received and accepted loan applications in Delaware, and a loan contract is consummated where the last act necessary for its formation occurs, *Bryan v. Bartlett,* 435 F.2d 28, 33 (8th Cir.1970), Minnesota "may not enact legislation that has the practical effect of regulating commerce that takes place wholly outside of its borders," *Eric M. Berman, P.C. v. City of New York,* 895 F.Supp.2d 453, 476–77 (E.D.N.Y.2012); *see Midwest Title Loans, Inc. v. Ripley,* 616 F.Supp.2d 897, 909 (S.D.Ind.2009) (holding that Indiana's attempts to regulate credit agreements between Illinois lender and Indiana residents violated the Dormant Commerce Clause), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills,* 593 F.3d 660 (7th Cir.2010).

Integrity's reliance on *Midwest Title* is misguided. In *Midwest Title,* all borrow-

ers had to physically present themselves at the lender's location in Illinois in order to enter into a binding loan agreement. *Ripley*, 616 F.Supp.2d at 905–06. Each loan that the lender made to an Indiana resident was in the form of a check, drawn on an Illinois bank, that was physically handed to the borrower at the lender's loan office in Illinois and could be cashed there. *Mills*, 593 F.3d at 669. The conditional transfer of title to the loan's collateral was made in Illinois, and the lender received the payments required by the loan agreement in Illinois. *Id.* In that case, the court held that Indiana sought to regulate commerce that was wholly extraterritorial. *Id.*

This case depends on facts that do not lead to the same conclusion. Contrary to Integrity's characterizations, its extension of payday loans to Minnesota residents did not occur wholly outside Minnesota's borders. *Quik Payday*, 549 F.3d at 1308 (holding that payday loans extended to Kansas borrowers from Utah were not wholly extraterritorial and therefore Kansas regulation thereof was not prohibited under the Dormant Commerce Clause). Minnesotans submitted applications for payday loans to Integrity from their computers located in Minnesota. Integrity then contacted loan applicants at their Minnesota homes shortly after each applicant completed the online application, called applicants at their Minnesota places of employment as part of the loan underwriting process, and contacted applicants' Minnesota financial institutions to confirm that the applicants' paychecks were automatically deposited into their bank accounts. Once applicants' loans were approved, Integrity routinely contacted Minnesota borrowers for a variety of other reasons, including to service its payday loans and to collect on delinquent accounts. As revealed by Integrity's business records, Integrity directed approximately 27,944 contacts to Minnesotans for the purpose of doing business in Minnesota. In addition to these contacts, it is undisputed that Integrity deposited payday loans directly into Minnesota borrowers' bank accounts and engaged in more than 20,000 transactions withdrawing interest and principal from these accounts. *See id.* (stating that even if a Kansas resident applied for a loan on a computer outside of Kansas, other aspects of the transaction would very likely occur in Kansas, "notably, the transfer of loan funds to the borrower would naturally be to a bank in Kansas").

We conclude that where the loan contract is consummated is not dispositive. Under the facts of this case, Minnesota's efforts to regulate payday loans that Integrity extended to Minnesotans do not violate the Dormant Commerce Clause.[2]

---

2. Integrity also argues that Minnesota's regulatory burdens violate the Due Process Clause of the Fourteenth Amendment because Integrity's payday loan transactions occurred outside of Minnesota and were governed by Delaware law. Integrity argues that because it did not specifically direct its actions at Minnesotans, it does not have sufficient contacts with Minnesota to justify jurisdiction. The undisputed facts establish that Integrity had many thousands of contacts with Minnesota residents for the purpose of conducting its business related to payday lending, and these contacts were not remotely confined to Delaware's borders. *Stork*, 549 F.3d at 1312

("Traditionally, when an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction [by the foreign jurisdiction over that entity] is proper.") (alteration in original) (quotation omitted); *see Marquette Nat'l Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 295 (Minn.1978) (stating that the mere fact a company does not have a physical presence in the state but conducts its business via telephone and mail does not bear on whether the company is subject to the state's jurisdiction). Integrity's due process argu-

## III.

■ Third, Integrity characterizes the district court's award of $7 million in statutory and civil damages as excessive and grossly disproportionate, arguing that the award violates the Excessive Fines Clauses of the Eighth Amendment to the United States Constitution and Article I, Section 5 of the Minnesota Constitution. A civil penalty may be imposed "in an amount to be determined by the court." Minn.Stat. § 8.31, subd. 3 (2012). The district court's determination of whether a damages award is excessive " 'will only be disturbed for a clear abuse of discretion.' " *Dallum v. Farmers Union Cent. Exch., Inc.*, 462 N.W.2d 608, 614 (Minn.App.1990) (quoting *Nelson v. Nelson*, 283 N.W.2d 375, 379 (Minn.1979)), *review denied* (Minn. Jan. 14, 1991). "Generally, we will not disturb a damage award unless the failure to do so would be shocking or would result in plain injustice." *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 555 (Minn.2008) (quotation omitted).

The district court awarded restitution damages, which Integrity does not contest, in the amount of $705,308 to refund to borrowers the total illegal interest collected by Integrity. Based on potential liability of up to $1,000 per violation for statutory damages, Minn.Stat. § 47.601, subd. 6(3), and civil penalties of up to $25,000 per violation, Minn.Stat. § 8.31, subd. 3 and after determining that Integrity (1) did not

act in good faith; (2) caused significant injury to the public; (3) collected shockingly usurious sums from "some of the State's most financially vulnerable citizens"; and (4) did not deserve to benefit from its "ill-gotten gains," the district court awarded $7 million to the state in combined damages. *See State by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 896–97 (Minn.App.1992) (holding that a district court "should consider the following factors in determining the size of a civil penalty: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the desire to eliminate the benefits derived by the violation."), *aff'd*, 500 N.W.2d 788 (Minn.1993). Despite Integrity's objections, the district court's award amounted to only 21% of the potential damages that the district court could have awarded under the statute. Based on sound reliance on the *Alpine* factors, the district court did not abuse its discretion when it determined that the $7 million award was appropriate.[3]

## IV.

■ Finally, Integrity argues that the district court lacked a basis for enjoining Integrity's lending activities in Minnesota until it registers with the department of commerce, acquires proper licensing, and complies with state law.[4] We disagree.

ment is entirely without merit, and we do not address it further.

3. Integrity also argues that, because it should have prevailed on its arguments that the Dormant Commerce Clause and the Due Process Clause prohibited Minnesota from regulating its online payday loans extended to Minnesotans, the district court erred in awarding costs, disbursements, and attorney fees to the state. Because both Minn.Stat. § 47.601, subd. 6(4), and Minn.Stat. § 8.31, subd 3a (2012), specifically impose liability for the state's costs, disbursements, and attorney

fees, and because Integrity's claims fail as a matter of law, the district court did not abuse its discretion in awarding costs, disbursements and reasonable attorney fees. *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 331 (Minn.App.2007) ("We will not reverse the district court's decision on attorney fees absent an abuse of discretion."), *review denied* (Minn. Aug. 21, 2007).

4. Integrity tangentially argues that the district court exceeded its authority by not only enjoining Integrity, but also its "principals, agents, servants, employees, successors, as-

A decision on whether to grant an injunction is within the sound discretion of the district court and "will not be disturbed on appeal unless, based upon the whole record, it appears that there has been an abuse of such discretion." *Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81, 91 (Minn.1979).

Both Minn.Stat. § 47.601, subd. 6(5), and Minn.Stat. § 8.31, subd. 3, specifically authorize injunctive relief. The attorney general's power to obtain injunctions under Minn.Stat. § 8.31 (2012) is broad. *State ex rel. Hatch v. Cross Country Bank, Inc.,* 703 N.W.2d 562, 573 (Minn.App.2005) (holding that a district court is not required to make findings under *Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) before enjoining statutory violations). The district court need only consider whether the state has shown that Integrity violated the statutes involved and whether injunctive relief would fulfill the legislative purpose of the statutes. *Id.*

The legislature enacted Minn.Stat. §§ 47.60 and 47.601 to protect financially vulnerable Minnesotans from predatory lending practices of the kind in which Integrity is engaged. The legislature specifically provided injunctive relief as a remedy for statutory violations. Thus, the district court did not abuse its discretion in enjoining Integrity's lending activities in Minnesota until Integrity registers with the department of commerce, acquires proper licensing, and complies with state law.

## DECISION

Because there is no genuine issue of material fact, the Dormant Commerce Clause does not preclude application of Minnesota law to regulate payday lending that does not occur wholly extraterritorially, and the district court did not abuse its discretion in either awarding damages or enjoining Integrity's payday lending activities in Minnesota, we affirm the district court's grant of summary judgment to the state.

**Affirmed.**

signs, and any person acting in concert or participation with" Integrity. This argument is without merit. Minn. R. Civ. P. 65.04 (providing that every order granting an injunction "is binding upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.").