*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2086
A14-0028**

State of Minnesota, by its Attorney General, Lori Swanson
and
its Commissioner of Commerce,
Michael Rothman,
Respondent,

vs.

CashCall, Inc.,
a California corporation, et al.,
Appellants.

**Filed August 18, 2014
Affirmed
Toussaint, Judge[*]**

Hennepin County District Court
File No. 27-CV-13-12740

Lori Swanson, Attorney General, Nathan Brennaman, Deputy Attorney General, Kevin Rodlund, Michael Tostengard, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Mark J. Briol, Scott A. Benson, Briol & Associates, PLLC, Minneapolis, Minnesota; and

Barry Levenstam (pro hac vice), Jenner & Block LLP, New York, New York, (for appellants)

Considered and decided by Bjorkman, Presiding Judge; Rodenberg, Judge; and

Toussaint, Judge.

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**TOUSSAINT**, Judge

Respondent State of Minnesota brought a consumer-enforcement action against appellants CashCall, Inc., and WS Funding, LLC, in July 2013, alleging that appellants are using a third company, Western Sky Financial, LLC, as a front to make usurious loans to Minnesota consumers. The state moved for a temporary injunction, and appellants moved to dismiss the state's complaint pursuant to Minnesota Rule of Civil Procedure 12.02(e). The district court granted the temporary injunction and denied the dismissal motion. Appellants challenged both rulings in these consolidated appeals. Because the district court did not err by denying the dismissal motion and did not abuse its discretion by granting the temporary injunction, we affirm.

**DECISION**

**I.**

Appellants CashCall and WS Funding argue that the district court erred by denying their motion to dismiss the state's complaint. We review de novo a district court's denial of a motion to dismiss under Rule 12.02(e) for failure to state a claim upon which relief can be granted. *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 861 (Minn. 2010). In doing so, we must "accept the facts alleged in the complaint as true and give the nonmoving party the benefit of all favorable inferences." *Id.* We are not bound by legal conclusions in a complaint. *Bahr v. Capella Univ.*, 788 N.W.2d 76, 80 (Minn. 2010). A complaint should be dismissed "only if it appears to a certainty that no facts,

2

which could be introduced consistent with the pleading, exist which would support granting the relief demanded." *Id.* (quotation omitted).

According to the complaint, WS Funding, a subsidiary of CashCall, entered into an agreement with Western Sky on December 28, 2009, that established the following system: CashCall maintains a deposit account in Western Sky's name that Western Sky uses to fund loans. Western Sky originates loans through its website and over the phone with Minnesota customers. If CashCall receives a loan application, it processes the application but funds the loan through Western Sky. Western Sky then sells the loans to WS Funding before the borrower makes a payment, and WS Funding assumes all rights of Western Sky to collect on the loans. CashCall and WS Funding bear the risk of nonpayment and indemnify Western Sky for all potential legal costs and fees.

The complaint alleges that CashCall and WS Funding "run virtually every . . . aspect of Western Sky's operations"; that they conduct the underwriting review of loan applications, provide customer service and technical service, host websites, supply fax and phone numbers, and service the loans, and that they also have the rights to use Western Sky's brand and image in advertisements. Based on the extent of CashCall and WS Funding's involvement, the state alleges that they are the "de facto" lenders of Western Sky's loans to Minnesota borrowers.

## A.    Tribal sovereign immunity

Appellants first argue that the state's complaint should be dismissed based on tribal sovereign immunity. Indian tribes are "domestic dependent nations that exercise inherent sovereign authority over their members and territories" and therefore are

3

immune to suits against them unless they clearly waive their immunity or Congress abrogates it. *Okla. Tax. Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509, 111 S. Ct. 905, 909 (1991). This immunity extends to entities that operate as "arms of the tribe." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2051 n.4 (2014) (Thomas, J., dissenting); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000). It does not apply, however, to individual tribe members. *Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.*, 433 U.S. 165, 172, 97 S. Ct. 2616, 2621 (1977).

Appellants argue that Western Sky is shielded by tribal sovereign immunity because it is owned by a tribal member, is located on a reservation, and finalizes its loans on a reservation. They further contend that because their contractual agreement with Western Sky allows them to "stand in the shoes" of Western Sky, they too have tribal sovereign immunity. But appellants cite no authority to support their position that tribal sovereign immunity is assignable. And even assuming that such an assignment is viable, appellants' claim fails because tribal sovereign immunity does not apply to Western Sky.

According to the state's complaint, Western Sky "is not owned or operated by an Indian tribe, is not a tribal entity, and does not exist for the benefit of a tribe." Rather, the state alleges that Western Sky is a South Dakota limited-liability company whose sole member holds himself out to be a member of the Cheyenne River Sioux Tribe (the CRST). The CRST did not approve Western Sky's creation, and Western Sky's profits do not benefit the tribe. Because we must accept these allegations as true, there is no reason to conclude that tribal sovereign immunity precludes the state's action.

4

Appellants argue otherwise by focusing on the location of Western Sky's operations and insisting that tribal sovereignty "*displaces state sovereignty* over affairs within a reservation" and that "Tribal members acting within the Reservation are subject to Tribal sovereignty *in place of* state sovereignty." This argument is flawed both factually and legally. The state has pleaded facts that would prove that Western Sky is not a tribal entity and conducts significant activity with Minnesota's borders. Appellants' arguments ignore these facts and focus instead solely on the location of Western Sky's operations. Such an approach is inappropriate when considering whether the state has presented a claim on which relief can be granted.

Moreover, taking the allegations in the complaint as true, there are no cases that support appellants' claim of immunity. Appellants rely heavily on a few Supreme Court cases. The first case is *Williams v. Lee*, 358 U.S. 217, 79 S. Ct. 269 (1959). In *Williams*, a non-Indian operated a general store on a reservation in Arizona. *Id.* at 217, 79 S. Ct. 269. He brought an action in an Arizona state court to collect for goods he sold on credit to an Indian couple who lived on the reservation. *Id.* at 217-18, 79 S. Ct. at 269. The question was whether the Arizona court had jurisdiction to hear the case. *Id.* at 218, 79 S. Ct. 269. The Supreme Court held that it did not, concluding that "to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." *Id.* at 223, 79 S. Ct. at 272.

Appellants argue that *Williams* precludes the state from bringing its action against them because Western Sky consummated its loans on the reservation. Their argument is

not persuasive. After making its decision, the *Williams* Court stated, "[i]t is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." *Id.* That scenario is distinguishable from the one at issue here. Even if Western Sky accepted its loan agreements on the reservation—a fact the state does not allege—the transactions did not entirely take place there, as the transaction did in *Williams*.

The same distinction applies to *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 93 S. Ct. 1257 (1973), another case on which appellants rely. *McClanahan*, as the Supreme Court stated, "involve[d] the narrow question whether the State [of Arizona] may tax a reservation Indian for income earned exclusively on the reservation." *Id.* at 168, 93 S. Ct. at 1260. The Court held that "by imposing the tax in question on [a reservation Indian], the State has interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal Government and the Indians themselves." *Id.* at 165, 93 S. Ct. at 1259. It stated, "[t]he tax is therefore unlawful as applied to reservation Indians with income derived wholly from reservation sources." *Id.* Again, this is distinguishable from the case at hand. The Supreme Court itself noted that *McClanahan* is not "a case where the State seeks to reach activity undertaken by reservation Indians on nonreservation lands." *Id.* at 168, 93 S. Ct. at 1260. This one is.

Appellants also highlight *Montana v. United States*, 450 U.S. 544, 101 S. Ct. 1245 (1981). In *Montana*, the Supreme Court considered whether a tribe has the power to regulate hunting and fishing on land within its reservation but owned by non-Indians. *Id.* at 547, 101 S. Ct. at 1249. The Court stated, as appellants quote, that "[a] tribe may

6

regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565, 101 S. Ct. at 1258. The Court held, however, that this principle did not apply because the non-Indian hunters and fishers "do not enter any agreements or dealings with the [tribe] so as to subject themselves to tribal civil jurisdiction." *Id.* at 556, 101 S. Ct. at 1259. Subsequent statements by the Supreme Court make clear that *Montana* is inapplicable. The Court has stated that "*Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 332, 128 S. Ct. 2709, 2721 (2008) (emphasis in original).

As these case summaries demonstrate, appellants' arguments do not correctly assert the state's allegations about Western Sky's activities in Minnesota. They instead emphasize that "the last act forming every Western Sky loan agreement occurred on the Reservation" and argue that the state may not regulate any "*activity by a tribal member within the Reservation.*" This is unsupported. "Long ago the [Supreme] Court departed from Mr. Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141, 100 S. Ct. 2578, 2582 (1980). "[E]ven on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S. Ct. 1267, 1270 (1973). More so, as the Minnesota Supreme Court has stated, "Indians who go 'beyond reservation boundaries have generally been held subject

to non-discriminatory state law otherwise applicable to all citizens of the State,' absent express federal law to the contrary." *In re Johnson*, 800 N.W.2d 134, 139 (Minn. 2011) (quoting *Mescalero Apache Tribe*, 411 U.S. at 148-49, 93 S. Ct. at 1270). "When . . . state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land . . . ." *Nevada v. Hicks*, 533 U.S. 353, 362, 121 S. Ct. 2304, 2311 (2001).

Appellants do not argue that the immunity they claim extends beyond the reservation. They state that it "extends only to individual tribal members, and only to activities on a reservation." Because the state's allegations concern activity occurring off the reservation, appellants' immunity argument does not justify dismissing the complaint.

### B.    Dormant Commerce Clause

Appellants argue next that the state's complaint should be dismissed based on the Commerce Clause. The U.S. Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl.3. "Although the Commerce Clause represents an affirmative grant of power to Congress, it has long been held to impliedly contain a negative command, commonly referred to as the 'Dormant' Commerce Clause, that the states may not discriminate against or unduly burden interstate commerce." *Chapman v. Comm'r of Revenue*, 651 N.W.2d 825, 832 (Minn. 2002). This principle precludes states from using statutes to regulate commerce that "takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336, 109 S. Ct. 2491, 2499 (1989) (quotation omitted). States may not "discriminate[] against

8

or place[] an undue burden on interstate commerce." *Stelzner v. Comm'r of Revenue*, 621 N.W.2d 736, 740 (Minn. 2001).

Commerce Clause challenges involve a two-step analysis. The first step is to determine whether the state action being challenged implicates the Commerce Clause. *Id.* If so, we then determine whether it violates the Commerce Clause. *Id.* The party challenging a state action on Commerce Clause grounds "bear[s] a heavy burden at each step of the inquiry." *Id.* Appellants' challenge does not pass the first step. They assert the state's action against them implicates the Commerce Clause because Western Sky consummates its loans on the CRST reservation. But as we recently decided, "where the loan contract is consummated is not dispositive" to the issue of preclusion under the Dormant Commerce Clause. *State ex rel. Swanson v. Integrity Advance, LLC*, 846 N.W.2d 435, 442 (Minn. App. 2014), *review granted* (Minn. June 17, 2014).

In *Integrity Advance*, we considered whether the Dormant Commerce Clause precluded Minnesota from applying its laws to loans consummated in Delaware. *Id.* at 441. The lender, represented by the same attorneys as appellants in this case, argued that it did, because the lender, "received and accepted loan applications in Delaware, and a loan contract is consummated where the last act necessary for its formation occurs." *Id.* We disagreed, recognizing that "[c]ontrary to [the lender's] characterizations, its extension of payday loans to Minnesota residents did not occur wholly outside Minnesota's borders." *Id.* at 442. We then detailed the lender's contacts with Minnesota and held that "Minnesota's efforts to regulate payday loans that [the lender] extended to Minnesota do not violate the Dormant Commerce Clause." *Id.*

9

The same analysis applies here. The state alleges that CashCall, WS Funding, and Western Sky all have significant contact with Minnesota. The complaint states that Western Sky and CashCall advertise in Minnesota, deposit loan money into Minnesota banks, send text and e-mail messages to individuals in Minnesota, collect money in Minnesota, and "direct many other commercial acts" into Minnesota. On the other end, Minnesota borrowers take out the loans while physically located in Minnesota using computers or telephones in Minnesota. As in *Integrity*, these facts demonstrate that the state's action does not violate the Dormant Commerce Clause.

Because appellants' arguments based on tribal sovereign immunity and the Dormant Commerce Clause fail, the district court did not err by denying their motion to dismiss the state's complaint.

## II.

Appellants also challenge the district court's grant of a temporary injunction. "A temporary injunction may be granted if by affidavit, deposition testimony, or oral testimony in court, it appears that sufficient grounds exist therefor." Minn. R. Civ. P. 65.02(b). "The party seeking the injunction must demonstrate that there is an inadequate legal remedy and that the injunction is necessary to prevent great and irreparable injury." *U.S. Bank Nat'l Ass'n v. Angeion Corp.*, 615 N.W.2d 425, 434 (Minn. App. 2000), *review denied* (Minn. Oct. 25, 2000). "The district court has broad discretion to grant or deny a temporary injunction, and we will reverse only for abuse of that discretion." *Id.*

Five factors are relevant when considering whether to sustain a district court's decision to grant a temporary injunction:

10

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 274-75, 137 N.W.2d 314, 321-22 (1965) (citations omitted). The party seeking an injunction's probability of success in the underlying action is "[a] primary factor." *Minneapolis Fed'n of Teachers, AFL-CIO, Local 59 v. Sch., Special Sch. Dist. No. 1*, 512 N.W.2d 107, 110 (Minn. App. 1994), *review denied* (Minn. Mar. 31, 1994).

A.    **Relationship between parties**

The district court determined that the state has "presented a credible showing that the parties' preexisting relationship . . . requires the [c]ourt to grant the injunction." It reviewed obligations of the attorney general and commissioner of commerce, through whom the state brought its action, as well as appellants' lending and collection history and their arguments in response to the state's complaint. Appellants argue that this analysis was improper because the *Dahlberg* court focused on the parties' expectations of each other to decide this factor. *See Dahlberg*, 272 Minn. at 276, 137 N.W.2d at 322. We disagree. Considering the parties' relationship in regard to the underlying action was

not an abuse of discretion. *See City of Mounds View v. Metro. Airports Comm'n*, 590 N.W.2d 355, 358 (Minn. App. 1999) (considering city and commission's prior litigation and statutory requirements).

## B. Potential harm to parties

The district court concluded that the balance between the harm to the parties "weighs strongly in favor of granting the injunction." Appellants argue that the state "made no showing that irreparable injury will occur in the absence of the Injunction." They assert that the district court improperly considered financial hardship, which they state justifies money damages but not an injunction. But the district court considered other "irreparable" harms, such as negative credit reports, home foreclosures, and difficulties obtaining mortgages, and found that money damages "are not a realistic remedy." Appellants also argue that imposing the injunction causes greater harm because it "attacks Western Sky's livelihood, and the jobs and economic activity brought to the impoverished Reservation by Western Sky's business." The record does not support this argument. The injunction enjoins CashCall and WS Funding from buying and servicing loans generated by Western Sky. It does not prevent Western Sky from operating its business. The district court did not abuse its discretion in its evaluation of the parties' potential harm.

## C. Likelihood of prevailing on underlying claims

The district court found that "the factual record strongly suggests that the State is particularly likely to prevail on at least four of its six claims." It closely analyzed each count of the complaint and the related statutes and thoroughly applied and evaluated the

12

relevant factual record. Appellants argue that this analysis was wrong. They present five reasons why the state is not likely to prevail on the merits of its claims. The first two are the Dormant Commerce Clause and tribal sovereign immunity. For the reasons discussed earlier, these arguments fail. Appellants' remaining arguments are that they are not liable as the lender in Western Sky's loans, that they are not liable for servicing loans originated by Western Sky, and that the state's earlier dismissal precludes it from bringing this action.

### 1.    Appellants' liability as lenders

Appellants contend that the district court erred "by adopting a 'de facto lender' theory, despite the absence of factual evidence and legal authority sufficient to support a 'de facto lender' conclusion." They rely on cases from various jurisdictions for support, but their argument is not convincing.

The state advances the "de facto lender" theory as a factual, not legal, basis for its action. It contends that appellants were so involved in Western Sky's loan procedure that they effectively became the lender. *See Black's Law Dictionary* 479 (9th ed. 2009) (defining "de facto" as "[a]ctual; existing in fact; having effect even though not formally or legally recognized"). The success of the state's complaint does not rest on a legal conclusion.

The district court stated that "the State has made a strong *factual* showing that, together, [appellants] and Western Sky are likely violating Minnesota law on a regular basis." (Emphasis added.) It based this finding on appellants' contractual agreements with Western Sky, testimony from the injunction hearing, affidavits submitted by both

13

sides, and Western Sky's consumer loan agreements, which state that "Lender" means Western Sky "and any subsequent holder of this Note." The court concluded,

> While there is a larger factual dispute regarding the actual extent of [appellants'] involvement in the lending process, the terms of the operating agreements and loan contracts establish that [appellants] have at least the authority to participate in the lending and underwriting decisions and have done so on occasion. These documents also show that the loans are inextricably linked to [appellants'] funding mechanism and operational support. In addition, the affidavit testimony from Minnesota borrowers supports the State's argument that [appellants] effectively control most of Western Sky's business decisions.

The district court's analysis demonstrates that this issue—whether appellants are lenders—is factual. With this understanding, appellants' legal argument that it is not a lender fails. We must give "great deference" to the district court's factual findings because it is not our province "to reconcile conflicting evidence." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999). Appellants highlight the extent of Western Sky's involvement in the loan process, but this evidence does not contradict the district court's finding that appellants are also involved enough that they can be considered a lender.[1] Appellants' argument therefore fails. *See id.* (stating that "[i]f there is reasonable evidence to support the trial court's findings of fact, a reviewing court should not disturb those findings").

---

[1] That is not to say that appellants actually are lenders and will be held liable as such. As the *Dahlberg* court stated, "the facts on which the [district] court acts in granting a temporary injunction are, by the nature of the situation, provisional and . . . the injunctive authority exercised will continue only until a more scientific analysis of the problem is made possible by trial on the merits." 272 Minn. at 274, 137 N.W.2d at 321. The district court decided that the state is likely to prevail on this issue, but the fact finder at trial will be the one to ultimately decide.

### 2. Appellants' liability for servicing Western Sky's loans

Appellants contend that they are also not liable for servicing loans originated by Western Sky. This position is based on two arguments: that the loans are not subject to Minnesota's lending regulations, and that the district court misinterpreted the relevant statutes. The first argument fails because appellants contend again that their loans are subject only to tribal law. As discussed before, Minnesota law can apply to the loans based on appellants' and Western Sky's activities in Minnesota. Accordingly, there is no issue of the district court "sever[ing]" the loans from the law governing them, as appellants assert. Appellants' second argument contends that the district court misinterpreted and misapplied several statutes referenced in the state's complaint.

#### a. Section 47.601

Appellants insist that the district court erred by determining that they are "consumer short-term lenders." Minnesota Statutes section 47.601, subdivision 1(e) (2012) defines "consumer short-term lender" as "an individual or entity engaged in the business of making or arranging consumer short-term loans." The district court concluded that "the evidence strongly suggests that [appellants] at least arrange the loans." Appellants assert that section 47.601 uses "arranging" and "making" to mean the same thing. But statutes must be construed to give effect to all their provisions. Minn. Stat. § 645.16 (2012). Appellant's argument would render "arranging" superfluous.

#### b. Section 56.18

Minnesota Statutes section 56.18 (2012) prohibits unlicensed persons from making loans. The statute states, however, that its provisions "shall not apply to loans legally

made in another state." *Id.* The district court decided this exception did not apply to appellants because their claim "that the borrowers consummated the loan on tribal territory" appears likely to fail on the merits. Appellants misconstrue the district court's statement to assert that the court decided that a reservation in South Dakota does not constitute "another state" than Minnesota. The district court made no such decision.

### c. Sections 334.01 and 325D.44

Appellants argue that the district court erred by concluding that the state is likely to prevail on its claims under Minnesota Statutes sections 334.01 and 325D.44 (2012). Their only argument about section 334.01 is that their loans are governed by tribal law and therefore Minnesota's usury laws do not apply. As for section 325D.44, they contend that the state cannot prevail on its claim that appellants deceived consumers by stating that Western Sky's loans are governed by tribal law because that statement is "legally correct." Because both arguments are based on the faulty premise that only tribal law applies to the loans, they fail.

### 3. Appellants' estoppel theory

Appellants' last argument why the state is unlikely to prevail is that the state's action is precluded by its agreement with Western Sky to dismiss its action against Western Sky. But appellants in no way explain why an agreement to which they are not a party has any bearing on the present case. Furthermore, they assert that "the record establishes the State and Western Sky agreed to dismissal on the grounds of the immunity of Western Sky's loans from Minnesota authority." Yet the part of the record they cite does not support that assertion. Appellants cite a memorandum by Western Sky's

16

attorney that argues that the state lacks jurisdiction to regulate Western Sky and an e-mail from the attorney general's office that states, "[t]he Department has agreed that Western Sky Financial . . . may be dismissed." Appellants' argument is legally and factually insufficient.

For all these reasons, appellants fail to show that the district court abused its discretion by finding that the state is likely to prevail on its claims.

### D.    Policy considerations

The district court stated, "[b]ecause the State appears likely to prevail in its underlying statutory claims against [appellants], the ongoing pattern of apparently illegal lending activity weighs heavily in favor of granting the requested injunction." Appellants argue that this conclusion was error because the state is violating tribal sovereignty and the Commerce Clause. As discussed previously, those arguments fail. Appellants also state that "the policy of enforcing voluntary contracts must be upheld." The district court considered this argument and dismissed it because the injunction does not prevent appellants from enforcing their existing loans. Appellants also assert that "[l]ack of access to high-risk, high-cost credit apparently has deleterious consequences." This argument overstates the issue. The injunction doesn't cut off all "high-risk, high-cost" loans; it permits appellants to make loans, so long as they comply with Minnesota's lending regulations. Appellants fail to demonstrate that the district court's policy determination was an abuse of discretion.

**E.    Administrative burdens**

The district court found that this injunction would impose, "at most, a minimal burden on the Court because it merely requires [appellants] to cease their current activities while this litigation proceeds."  Appellants concede that "the Injunction creates little administrative burden for the district court."

Based on the foregoing analysis, the district court did not abuse its discretion when analyzing the *Dahlberg* factors.  Appellants argue at great length about why the analysis could have come out differently, but difference of opinion does not constitute abuse of discretion.  Appellants' argument against the temporary injunction fails.

**Affirmed.**